## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| DARLINGTON AMADASU, | : | Case No.: C-1-01-182 |
|---|---|---|
|  | : |  |
| Plaintiff, | : | Judge S. Arthur Spiegel |
|  | : | Magistrate Judge Timothy S. Black |
| v. | : |  |
|  | : |  |
|  | : |  |
| MERCY FRANCISCAN HOSPITAL - | : | **DEFENDANT RAVI B. BERRY, M.D.'S** |
| WESTERN HILLS, et al. | : | **RESPONSES AND OBJECTIONS TO** |
|  | : | **PLAINTIFF'S REQUESTS FOR** |
| Defendants. | : | **ADMISSIONS** |

Defendant Ravi B. Berry, M.D. ("Defendant Dr. Berry") hereby responds to Plaintiff's Requests for Admissions as follows:

## GENERAL OBJECTIONS

Defendant Dr. Berry asserts the following general objections to Plaintiff's Request for Admissions, pursuant to Federal Rules of Civil Procedure 36 and 26(b):

a.    Defendant Dr. Berry objects to the extent these requests (and the accompanying instructions) are vague, confusing, incomprehensible, overbroad, compound, or seek information not calculated to lead to the discovery of admissible evidence and seek to impose unwarranted burdens on him.

b.    Defendant Dr. Berry objects to Plaintiff's requests to the extent they seek to invade the attorney-client privilege and work product protection to which he is entitled and/or other privileges recognized by the law.

Ex. 144

k.      Defendant Dr. Berry objects to Plaintiff's "instructions" to the extent they purport

to modify or alter the provisions of the Federal Rules of Civil Procedure.

l.      Defendant Dr. Berry objects to each request to the extent it purports to impose

any obligation greater than those provided by the applicable law and rules governing the proper

scope and extent of discovery.

m.      Any failure to specifically mention a general objection in Defendant Dr. Berry's

responses, shall not be deemed a waiver of any objection to any request.

Without waiving the foregoing objections, Defendant Dr. Berry responds to Plaintiff's

requests as follows:

## REQUESTS FOR ADMISSION



1.      Admit that you have no records of communications between you and receiving/transferee

physician of the purported Crisis Stabilization Center regarding transfer thereto.



**RESPONSE: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry admits he personally does not have separate records relating to Plaintiff's transfer to the Crisis Stabilization Center and refers Plaintiff to the medical chart previously produced by Defendant Mercy. Defendant Dr. Berry denies he had any obligation to maintain records separate and apart from those maintained by Defendant Mercy.**



2.      Admit that you have no and cannot produce documents showing that you and or your

qualified designee communicated with plaintiff in order for him to make informed consent for

transfer to Crisis Stabilization Center (CSC).



**RESPONSE: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry admits he personally does not have separate records relating to Plaintiff's transfer to the Crisis Stabilization Center and refers Plaintiff to the medica' chart previously produced by Defendant Mercy. Defendant Dr. Berry denies he had any obligation to maintain records separate and apart from those maintained by Defendant Mercy.**

3

$E\not{x}./4S$

3.     Admit that you failed to execute "Doctor Certification for Patient-Plaintiff Transfer

Order" to Crisis Stabilization Center (CSC) showing executed sections, i.e., Patient Condition,

Receiving Facility-CSC, Method of Transfer, Reason for Transfer, Patient-Plaintiff Certification

and Signature, Doctor's Certification and Signature, and Summary of the risks and benefits upon

which the certification is based.

**RESPONSE: See General Objections. In addition, Defendant Dr. Berry objects to this request on the basis of incoherence. Subject to and without waiving those objections, Defendant Dr. Berry denies this request and denies he had an obligation to execute such document(s). Defendant Dr. Berry further objects to the presumption of any such obligation and states that a transfer to CSC would be arranged by hospital staff.**

4.     Admit that you have no or you cannot produce signed document or certification of the

receiving facility-CSC showing availability of space and qualified personnel for the treatment of

the plaintiff, agreement to accept transfer of plaintiff and to provide appropriate medical

treatment that should you have enabled your order to transfer.

**RESPONSE: See General Objections. In addition, Defendant Dr. Berry objects to this request on the basis of incoherence. Subject to and without waiving those objections, Defendant Dr. Berry admits he personally does not have separate records relating to Plaintiff's transfer to the Crisis Stabilization Center and refers Plaintiff to the medical chart previously produced by Defendant Mercy. Defendant Dr. Berry denies he had any obligation to maintain records separate and apart from those maintained by Defendant Mercy. Defendant Dr. Berry further denies the existence any obligation to execute such document(s) and objects to the presumption of any such obligation.**

5.     Admit that you have no document showing the date and time of the day that receiving

facility-CSC and or receiving physician or designated qualified medical staff of CSC received

and accepted plaintiff upon his transfer by you.

**RESPONSE: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry admits he personally does not have separate records relating to Plaintiff's transfer to the Crisis Stabilization Center and refers Plaintiff to the medical chart previously produced by Defendant Mercy. Defendant Dr. Berry denies he had any obligation to maintain records separate and apart from those maintained by co-Defendant Mercy. Defendant Dr. Berry further denies any obligation to execute such document(s) and objects to the presumption of any such obligation.**

4

$E4.146$

6.    Please describe fully the circumstances under which you first came into contact with the plaintiff with regard to the problem for which you were attending the plaintiff and indicate the date and time of day thereof, and state all you told plaintiff on the first day of contact.

**RESPONSE: See General Objections. Defendant Dr. Berry further objects on the basis that this request is not a request for admission, is incomplete, calls for a narrative response, and is not the proper subject of a request for admission or interrogatory. As such, an admission or denial cannot be made and is not required.**

7.    Admit that you failed to assess and document the actual state of the plaintiff's health, illnesses and conditions at the time of his discharge, transfer and the termination of your professional relationship with the plaintiff including in diagnosis, differential diagnosis, course of treatment, progression, prognosis of each of the complaints, conditions, illnesses, or injuries that plaintiff had.

**RESPONSE: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

8.    Admit:

(a)    That on 10/6/00 you told Mercy F. Hospital (MFH) security agents who documented that "per Psych Dr Berry subject (plaintiff) has record for spousal abuse & assault on a police officer - Also per Dr. Berry subject is believed to carry out either threats mode or statements of violence by same."

(b)    That the above statement is wholly false.

(c)    That you also told the MFH security who documented that "Dr. Berry informed security to have subject taken off property"

(d)    That you had no basis or reason for directing security take plaintiff off the MFH.

5

Ex. 147

**RESPONSE: See General Objections.** Defendant **Dr. Berry further objects to the compound nature of the request. Subject to and without waiving those objections, Defendant Dr. Berry states that he does not recall making the quoted statements. Defendant Dr. Berry denies this request, including subparts (a) through (d), and further states that the records of Defendant Mercy speak for themselves.**

 9.    Regarding the informed consent for transfer to Crisis Stabilization Center, admit

(a)    that you failed to obtained plaintiff's signed written informed consent for transfer

to Crisis Stabilization Center

(b)    that no body or person obtained signed written informed consent from plaintiff

before transfer,

(c)    that neither you nor any other person made any communication or disclosure to

the plaintiff for the purpose of obtaining the mandatory signed written consent for the transfer,

(d)    that nobody in any manner, oral or in writing, communicated any plaintiff's

consent to you that should have enabled you to order transfer

(e)    that you do not and cannot produce plaintiff's signed written informed consent to

transfer.

**RESPONSE: See General Objections.** Defendant **Dr. Berry further objects to the compound nature of the request. Subject to and without waiving those objections, Defendant Dr. Berry denies this request, including subparts (a) through (e). Defendant Dr. Berry further denies any obligation to have such consent document(s) be executed and objects to the presumption of any such obligation.**

 10.    Admit that you failed to follow the accepted standard of care for taking and documenting

complete plaintiff's **medical** and **psychiatric** histories including all chief complaints, history of

present illnesses, past history, family history, review of systems. personal or social history,

diagnosis as you received it or otherwise as you should have taken them.

**RESPONSE: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

6

$Ex. 148$

11.    Concerning plaintiff's complaint of **respiratory problems** such as shortness of breath, chest tightness, for which you prescribed medication(s), admit

(a)    that you failed to follow the accepted standard of care for plaintiff's presenting respiratory problems

(b)    that you failed to document symptoms and history given by plaintiff or take your own history

(c)    that you failed to perform related physical examination on the plaintiff on first and subsequent occasions and failed to make list of your findings.

(d)    That you failed to perform or ordered diagnostic tests and procedures.

(e)    That you failed to have conversations with the plaintiff during the course of your treating him

(f)    That you failed to make consultation requests to pulmonary/respiratory specialists or other health profession specialist

(g)    That your ordered treatment for the condition was not based on any objective clinical data or findings

(h)    That you failed to monitor or document the course and the progression of the plaintiff's symptoms and signs or response to treatment.

**RESPONSE: See General Objections. Defendant Dr. Berry also objects to this request on the basis that it is compound and incoherent. Defendant Dr. Berry states that he has an obligation to treat all of his patients, but objects to and denies any presumption that he necessarily had an obligation to do all of the things stated in subparts (a) through (h) or that liability may be imputed to him for failure to do any of them. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

12.    At any time during your care of the plaintiff for the problem for which you were attending to the plaintiff, you formed the opinion or diagnosis that the plaintiff had developed **diarrhea** or an **infection of the digestive system**, admit:

7

E4. 149

(a)     That you failed to follow the accepted standard care for plaintiff's diarrhea or gastro-intestinal problem

(b)     That you failed to document symptoms and history given by plaintiff and you failed to take history before and during the course of your treating plaintiff

(c)     That you failed to perform related physical examination on the first and subsequent contacts and you failed to make your findings upon which to make your opinion.

(d)     That you failed to perform or ordered any diagnostic tests and procedures.

(e)     That you failed to make consultation requests to infectious diseases and or gastroenterological specialists to manage or assist in management of the condition.

(f)     That you failed to monitor and document the course and the progression of the plaintiff's symptoms and signs throughout the course of your treating it.

(g)     That you failed to take steps to determine the etiology and or organism responsible for the condition

(h)     That you failed to obtain the data on which you should have based your opinion and prescription. and or take steps to obtain positive identification of the causes and the organism responsible.

**RESPONSE: See General Objections. Defendant Dr. Berry also objects to this request on the basis that it is compound and incoherent. Defendant Dr. Berry states that he has an obligation to treat all of his patients, but objects to and denies any presumption that he necessarily had an obligation to do all of the things stated in subparts (a) through (h) or that liability may be imputed to him for failure to do any of them. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

$Ex. 150$



13.    At any time during your care of the plaintiff for the problem in #12 for which you were attending to the plaintiff, admit:

(a)    that you prescribed a course of medication, e.g., Flagyl for the treatment or relief of the symptoms of the plaintiff's condition without obtaining data such as taking history, performing related examination, microbiological tests and making findings:

(b)    that you failed to make findings or the data on which you should have based your determination to prescribe the particular antibiotic or combination of medications for the condition.

(d)    that prior to prescription of medication you failed to obtain specimen or specimens for culture and sensitivity the plaintiff's body or stools,

(e)    that you failed to assess whether there was any abatement or relief from the symptoms following the administration of the medication.



**RESPONSE: See General Objections. Defendant Dr. Berry also objects to this request on the basis that it is compound and incoherent. Defendant Dr. Berry states that he has an obligation to treat all of his patients, but objects to and denies any presumption that he necessarily had an obligation to do all of the things stated in subparts (a) through (d) or that liability may be imputed to him for failure to do any of them. Subject to and without waiving those objections, Defendant Dr. Berry admits he signed off on a physician's order form that included Flagyl on 4/25/00, based on information he received either from the patient, the emergency room, or the medical doctor or nurse who examined the patient. Defendant Dr. Berry denies the remainder of this request.**

14.    Concerning plaintiff's complaint of **uro-genital problems** such as his scrotal swelling, admit:

(a)    that you failed to follow the accepted standard of care for plaintiff's scrotal swelling

(b)    that you failed to document the history given by plaintiff and taken by you on the first and subsequent contact with plaintiff.

9



(c)     that you failed to perform the examination relative to the scrotal swelling and

failed to make findings.

(d)     That you failed to perform or order diagnostic tests and procedures relative to

scrotal swelling.

(e)     That you failed to make consultation requests to urologist and or other related

specialists

(f)     That you failed to care about or treat the condition

(g)     That you failed to document the course and the progression of the plaintiff's

scrotal swelling.

**RESPONSE: See General Objections. Defendant Dr. Berry also objects to this request on the basis that it is compound and incoherent. Defendant Dr. Berry states that he has an obligation to treat all of his patients, but objects to and denies any presumption that he necessarily had an obligation to do all of the things stated in subparts (a) through (g) or that liability may be imputed to him for failure to do any of them. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

15.     Concerning plaintiff's complaint of **mental and or psychiatric problems**, admit:

(a)     that you failed to follow the accepted standard of care for plaintiff's presenting

with such mental and or psychiatric conditions

(b)     that you failed to make complete history, including psychiatric history, medical

history, physical illnesses history, all complaint, history of present mental condition or illness,

past history, family history, review of systems, personal or social history as you received it or

otherwise knew it to be on the occasion of your first and later contacts with the plaintiff with

regard to the mental conditions for which you were attending the plaintiff

(c)     that you failed to perform any physical and neurological examinations on the

plaintiff on first and subsequent occasions of contacts and failed to make fully appropriate

findings.

10

$E4.152$

(d)    That you failed to order performance of relevant diagnostic laboratory tests and

procedures.

(e)    That you failed to perform psychological and projective tests and procedures and

failed to produce results of any testing result.

(f)    that you failed to have any treatment and discharge planning meeting with

plaintiff in course of your treating him

(g)    that you failed make consultation requests to other medical specialists regarding

plaintiff's presenting medical and or physical illnesses (i.e., respiratory, urino-genital and

gastroenterological illnesses and symptoms)

**RESPONSE: See General Objections. Defendant Dr. Berry also objects to this request on the basis that it is compound and incoherent. Defendant Dr. Berry states that he has an obligation to treat all of his patients, but objects to and denies any presumption that he necessarily had an obligation to do all of the things stated in subparts (a) through (g) or that liability may be imputed to him for failure to do any of them. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

16.    Admit that you did not perform any of the following psychological and psychiatric tests

or procedures on the plaintiff:

- (a)    Henet-type intelligence test,
- (b)    Rorschack Psychodiagnostic test,
- (c)    Wechsler-type test,
- (d)    Thermatic Apperceptions test,
- (e)    Blacky pictures test,
- (f)    Gestalt test,
- (g)    Goodenough Intelligence test,
- (h)    figure drawings or house-Tree-Person drawing test,
- (i)    word association test,

11

$E4.153$

(j)      sentence completion test,

(k)      Minnesota Multiphasic Personality Inventory



**RESPONSE: See General Objections. Defendant Dr. Berry also objects to this request on the basis that it is compound. Defendant Dr. Berry further objects to and denies any presumption that he necessarily had an obligation to do all of the things stated in subparts (a) through (k) or that liability may be imputed to him for failure to do any of them. Subject to and without waiving those objections, Defendant Dr. Berry admits he did not do the psychological testing of Plaintiff listed in subparts (a) through (k) of this request, and states that it was not indicated.**

17.    Admit that you

(a)      had no treatment and discharge planning sessions or meetings that plaintiff

participated in during the period of inpatient hospitalization

(b)      had no reason(s) for not conducting treatment and discharge planning sessions or

meetings involving participation of plaintiff

(c)      have no existence of any written notes or recorded duplications of any treatment

and discharge planning session or meeting,

**RESPONSE: See General Objections. Defendant Dr. Berry also objects to this request on the basis that it is compound. Defendant Dr. Berry further objects to and denies any presumption that he necessarily had an obligation to do all of the things stated in subparts (a) through (c) or that liability may be imputed to him for failure to do any of them. Subject to and without waiving those objections, Defendant Dr. Berry denies subparts (a) through (c) of this request.**

18.    Concerning the transfer of a patient from one medical care provider to another (physician

and medical facility), admit that you either lacked knowledge of or have knowledge of but failed

to follow

(a)      professional definition of an appropriate transfer of a patient

(b)      the accepted standard of care for transfer

(c)      the required steps, components, procedures and phases that must be satisfied to

meet the standard

E+. 154

**RESPONSE: See General Objections.   Defendant Dr. Berry further objects to the compound nature of the request.   Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

19.   Admit that either you were not knowledgeable about, not familiar with or if knowledgeable about, and familiar with but you failed to follow the statutory, regulatory, and professional standard of care for transfer of patient established by:

(a)   Mercy Franciscan Hospital (MFH) policies, procedures, rules, regulations and guidelines ("Bylaws")

(b)   Joint Commission on Accreditation of Healthcare Organizations (JCAHO)

(c)   American College of Emergency Physicians (ACEP)

(f)   Section 9121 of Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 USC 1395 ct seq. or Section 1867 of the Social Security Act. Collectively ("COBRA, EMTALA, or ANTI-DUMPING LAW")

(g)   American Medical Association ("AMA")

(h)   American Psychiatric Association ("APA")

(i)   Ohio Mental Health Law (OHMHL) and Ohio Administrative Code (OAC)--Anti-

dumping law

**RESPONSE: See General Objections.   Defendant Dr. Berry further objects to the compound and confusing nature of this request and the premises upon which it is based. Subject to and without waiving those objections, Defendant Dr. Berry denies violation of any implied obligations which may be found in this request.**

20.   Regarding **'informed consent'** of a patient, Admit that you have:

(a)   Knowledge of the definition of what 'informed consent' of a patient is

(b)   knowledge and experience of professional standard of care for informed consent

(c)   knowledge of Ohio informed consent law

13

$Ex. 155$

(d)    knowledge of MFH informed consent policy and procedure

(e)    knowledge of the elements, components or requirements fundamental to the concept

(c)    but you failed to apply that knowledge to obtain signed written informed consent of

plaintiff for transfer



**RESPONSE: See General Objections.    Defendant Dr. Berry further objects to the compound nature of the request.    Subject to and without waiving those objections, Defendant Dr. Berry admits subparts (a) through (e) of this request. Defendant Dr. Berry denies the last, improperly lettered, subpart (c) of this request, asking that Dr. Berry admit he "failed to apply that knowledge to obtain signed written informed consent of plaintiff for transfer."**

21.    Admit Crisis Stabilization Center (CSC),

(a)    has no appropriate private rooms.    Rather it has shared dormitory or hall of rows

of sleeping beds

(b)    has no proper organizational structure of the medical and non-medical staff

(b)    has no appropriate facilities for providing medical and psychiatric evaluations,

diagnosis, treatment and services for plaintiff's problems

(c)    has patients and inmates typified and characterized as psychotic, insane,

alcoholic, drug-addicts, ex-convicts, homeless, smoking-addicts

(d)    has inmates with type and nature of crisis, illnesses and conditions such as

psychosis, alcoholism, insanity, drug-addiction, homelessness, which plaintiff did not have

**RESPONSE: See General Objections. Defendant Dr. Berry further objects to the compound nature of the request.    Subject to and without waiving those objections, Defendant Dr. Berry denies any implied obligation that may impute liability to Defendant Dr. Berry by this request.    Defendant Dr.    Berry further objects to Plaintiff's characterizations in subpart (c) of this request and further denies knowledge of who was at the CSC at the relevant time period at issue in this case.  Subject to and without waiving those objections,  Defendant Dr. Berry denies subpart (a), both subparts lettered (b), and subpart (d) of this request.  Defendant Dr. Berry admits the Crisis Stabilization Center treats individuals who suffer from psychological and substance-abuse problems.**

14

$Ex. 156$

22.     Concerning the transfer of plaintiff from Mercy Franciscan Hospital (MFH) to the purported Crisis Stabilization Center (CSC), admit:

(a)     that you did not execute each required step and procedure in every phase of the transfer

(b)     that plaintiff was transported in a taxi with an unknown stranger to CSC without plaintiff's consent

(c)     that no communications, discussions or disclosures were made to plaintiff to elicit his informed consent or plaintiff was not 'informed' in order to give 'informed consent' to transfer

(d)     that plaintiff did not fit into the characteristics of patient and had no type of crisis and illnesses indicative of being transferred to CSC and you had no data upon which you based your determination to transfer

(e)     that plaintiff had no crisis or condition whatsoever, indicative of being transferred to CSC and no data on which you based your order to transfer

(f)     that plaintiff's medical record was transferred to CSC with plaintiff's authorization

(g)     that you never took or executed any of the accepted steps, procedures and processes of professional and statutory standard of care for transfer established by MFH, JCAHO, ACEP, "COBRA, EMTALA, or ANTI-DUMPING LAW", APA, AMA, so state your



bases

**RESPONSE: See General Objections. Defendant Dr. Berry also objects to this request on the basis that it is compound and incoherent. Defendant Dr. Berry further objects to and denies any presumption that he had an obligation to do anything as a result of the references generally identified in subparts (g) or that liability may be imputed to him in any way by such references. Subject to and without waiving those objections, Defendant Dr. Berry admits Plaintiff was transported to the Crisis Stabilization Center via taxi. Defendant Dr. Berry denies the remainder of subpart (b) and the entirety of subparts (a) and (c) through (g) of this request.**

15

$Ex. 157$



23.     Admit at the time you agreed to care for the plaintiff for the illnesses or conditions for which you were treating the plaintiff,

(a)     that you did not inform the plaintiff of any limitation upon the type, scope, or special medicine you were licensed, qualified or willing to practice in your relation with the plaintiff

(b)     that you have no limitation,

(c)     that you have no reasons for failing to perform medical history, physical examination and diagnostic tests on plaintiff's medical or physical illnesses



**RESPONSE:** See General Objections. Defendant Dr. Berry also objects to this request on the basis that it is compound, incoherent and confusing.  Subject to and without waiving those objections, Defendant Dr. Berry admits he is a psychiatrist and that Plaintiff was aware of this fact when Dr. Berry treated him. Defendant Dr. Berry further admits he is qualified to treat psychiatric patients and never made representations otherwise to Plaintiff. Beyond that, Defendant Dr. Berry denies subparts (a) through (c) of this request.

24.     Admit the medical record shows that (a) you did not request another medical specialist or member of the health care profession for an opinion or for assistance with the plaintiff's medical conditions, other than psychiatric condition; (b) you have no reasons for not seeking such consultations for plaintiff



**RESPONSE:** See General Objections.  Subject to and without waiving those objections, Defendant Dr. Berry denies this request and states that the medical chart previously produced by Defendant Mercy speaks for itself.  Further, Defendant Dr. Berry denies any implied obligation that may impute liability to Defendant Dr. Berry by this request.

25.     Admit that the medical and psychiatric standard of care usually highly correlates with professionally accepted clinical medical and psychiatric textbooks, literatures, journals, treatises, guidelines, and clinical training programs.

**RESPONSE:** See General Objections. Defendant Dr. Berry also objects to this request on the grounds that it is incoherent and confusing.  Subject to and without waiving those objections, Defendant Dr. Berry denies Plaintiff's implications, as to the sources identified.

16



26.    Admit that medical/psychiatric standard of care correlates, e.g., with (a) American Psychiatric Association (APA) 1993 Guidelines for Psychiatric Practice in Psychiatric Inpatient Facilities in Am J Psychiatry 151:5, May 1994; (b) American Psychiatric Association (APA) Practice Guidelines for Treatment of Psychiatric Disorders-Compendium 2000; (c) *Kaplan & Sadock's* Comprehensive Textbook of Psychiatry, Seventh edition, pub. Lippincott Williams & Wilkins; (c) Manual of Clinical Hospital Psychiatry, edited by Ole J. Thienhaus, M.D., Assoc, Prof. Of Psychiatry, University of Cincinnati College Medicine, Cincinnati, Ohio, published by American Psychiatric Press, Inc.; (d) World Psychiatric Association Guidelines; (e) Clinical Psychiatry for Medical Students, Third Edition (1998), Edited by Alan Stoudemire, MD. Published by Lippincott-Raven; and all are authoritative.

**RESPONSE: See General Objections. Defendant Dr. Berry also objects to this request on the basis that it is compound, incoherent and confusing. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

Regarding the plaintiff's medical record:

27.    Admit that the medical records demonstrate that your "Physician Attestation" shows you made only primary psychiatric diagnosis but failed to make and document other secondary medical diagnosis and procedures.

**RESPONSE: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry denies this request and refers Plaintiff to the medical chart previously produced by Defendant Mercy, which speaks for itself.**

28.    Admit that the medical records contain document, e.g., "Doctor Certification of Patient Transfer Order", showing that standard of care for transfer was followed when MFH-Westernhills transferred plaintiff to MFH-Mt Airy but on the contrary, the medical records lacks "Doctor Certification of Patient Transfer Order" for transfer from MFHMA to CSC showing that

17

$Ex. 159$

transfer standard of care was not followed when MFH-Mt Airy transferred plaintiff to Crisis

Stabilization Center (CSC).

**RESPONSE: See General Objections. Defendant Dr. Berry also objects to this request on the basis that it is compound, incoherent and confusing. Subject to and without waiving those objections, Defendant Dr. Berry denies this request and refers Plaintiff to the medical chart previously produced by Defendant Mercy, which speaks for itself.**

29.     Admit that the medical records' Emergency Department Record & Dept of Emergency

Services Triage Notes and Routing Form are without documentation for appropriate medical

screenings such as triages, complaints, history, past medical history, review of systems,

examinations, diagnostic tests, physical findings, diagnosis for plaintiff's medical or physical

illnesses, namely, respiratory, digestive and genitourinary systems problems or illnesses

**RESPONSE: See General Objections.  Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

30.     Admit that the medical records' "Discharge Summary" is deficient and without (a)

summary of all the physical complaints, medical history, past medical history, review of systems,

physical examination, pertinent diagnostic tests, physical findings, diagnosis for plaintiff's

medical or physical illnesses, namely, respiratory, digestive and genitourinary systems problems

or illnesses; (b) medical diagnosis for which Atrovent, Albuterol and Flagyl were prescribed and

response thereto; (c) plaintiff' condition when discharged and prognosis

**RESPONSE: See General Objections.  Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

31.     Admit that plaintiff had general medical condition but you failed to cover the Axis III of

*Diagnostic and Statistical Manual of Mental Disorders*, (DSM) in your diagnosis by not entering

plaintiff's general medical conditions (e.g., respiratory, digestive and genitourinary systems

diseases) in "Axis III" of the DSM.

Ex. 160

**RESPONSE**: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.



32.    Admit that you documented in the medical record that plaintiff was transferred against his reluctance and transported by Taxis to CSC unaccompanied by any hospital medical staff



**RESPONSE**: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.

33.    Admit that your admission note shows that you did not perform full medical and psychiatric assessment by failing to obtain, perform and or document physical complaints, medical history, past medical history, review of systems, physical examination, pertinent diagnostic tests, physical findings, diagnosis for plaintiff's medical or physical illnesses, namely, respiratory, digestive and genitourinary systems, problems or illnesses

**RESPONSE**: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.



34.    Admit that your admission note shows that on the first day 4/25/00 you met plaintiff, you immediately decided to transfer patient to CSC without enabling data and without discussing it with plaintiff

**RESPONSE**: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.

35.    Admit that your progress notes from start to finish show that you failed to monitor, evaluate and note the condition, response of plaintiff's respiratory, digestive and genitourinary systems problems or illnesses to the medications you prescribed without appropriate medical screening. data and diagnosis.

**RESPONSE**: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.

36.    Admit as true the American Psychiatric Association (APA) guidelines/standard of care that:    "mentally    ill    patients    require    comprehensive    differential    diagnostic    evaluation,

19

E4./61

comprehensive and integrated treatment planning, and medical management in all three of the biological, psychological, and social spheres; medical problems frequently complicate the psychiatric problems of this patient population, requiring prompt diagnosis, treatment, and management; the treatment of mentally ill patients in inpatient facilities requires medical management that frequently includes the prescription of medication and other somatic therapies, which often require physical and psychological preparatory workup and continued monitoring; Practitioners of the medical specialty of psychiatry have the medical training and skills needed to evaluate physical problems as well as their relationship to psychological and social phenomena; but you failed to follow these APA's standard of care

**RESPONSE: See General Objections. Defendant Dr. Berry also objects to this request on the grounds that it is compound, incomplete, contains no references as to the source of the quoted standard, is incoherent, and appears to be paraphrased. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

37.     Admit as true but you failed to adhere to APA guidelines that: each patient should receive timely, comprehensive psychiatric evaluation, diagnosis, and treatment planning in the biological, psychological, and social spheres; each patient should be medically screened and his or her history should be reviewed to assure that the full range of medical and surgical considerations is taken into account in determining the diagnosis and appropriate treatment; medical or surgical consultation should be assured; psychiatrist should assure involvement of patients and families in treatment and discharge planning.

**RESPONSE: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

38.     Admit that, according to APA, psychiatrists should adhere to the Principles of Medical Ethics (of. e.g., APA, AMA, WPA-World Psychiatric Association)

20

$Ex./62$

**RESPONSE: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry admits that psychiatrists are required to adhere to ethics principles and admits he adhered to such principles at all times relevant for purposes of this lawsuit.**

39. Admit that Ohio and Federal statutory standard of care correlate with the professional

standard of care of APA, AMA, WPA, ACEP, JCAHO and you failed to adhere to Ohio and

Federal statutory standard of care while you were treating plaintiff.

**RESPONSE: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

40. Admit that the plaintiff's medical records demonstrates that you failed to adhere to Ohio

and Federal statutory standard of care as well as the professional standard of care of APA, AMA,

WPA, ACEP, and JCAHO for appropriate medical screening, treatment, management, medical

record documentations, informed consent, and transfer.

**RESPONSE: See General Objections. Subject to and without waiving those objections, Defendant Dr. Berry denies this request.**

Respectfully submitted,

Deborah R/ Lydon (0013322)
Jennifer Orr Mitchell (0069594)
Matthew S. Arend (0079688)
DINSMORE & SHOHL LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, OH 45202
(513) 977-8200
*Counsel for Defendant Dr. Berry*

Ex. 163

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DARLINGTON AMADASU, pro se | : | Case No.: C-1-01-182 |
| | : | |
| Plaintiff, | : | Judge S. Arthur Spiegel |
| | : | Magistrate Judge Timothy S. Black |
| v. | : | |
| | : | |
| MERCY FRANCISCAN HOSPITAL - | : | **DEFENDANT RAVI B. BERRY, M.D.'S** |
| WESTERN HILLS, et al. | : | **RESPONSES TO PLAINTIFF'S** |
| | : | **REQUESTS FOR PRODUCTION** |
| Defendants. | : | |
| | : | |

Defendant Ravi B. Berry, M.D. ("Defendant Dr. Berry") hereby responds and objects to

Plaintiff's Requests for Production of Documents, pursuant to Federal Rule of Civil P. 34, as

follows:

## GENERAL OBJECTIONS

Defendant asserts the following general objections to Plaintiff's Requests for Production of

Documents, pursuant to FRCP 34 and 26(b):

a.    Defendant Dr. Berry objects to the extent these requests are vague, confusing,

incomprehensible, overbroad, compound, or seek information not calculated to lead to the discovery

of admissible evidence and seek to impose unwarranted burdens on him.

b.    Defendant Dr. Berry objects to Plaintiff's requests to the extent they seek to invade

the attorney-client privilege and work product protection to which he is entitled and/or other

privileges recognized by the law.

c.    Defendant Dr. Berry objects to the extent Plaintiff's requests seek confidential

information, particularly in the absence of an appropriate protective order to preserve the

confidentiality of such information.

E+ . 164

11/7/06

d.      Defendant Dr. Berry objects to certain of Plaintiff's requests because they seek information that is not a proper subject matter for a Request for Production of Documents.

e.      Defendant Dr. Berry further objects to the extent Plaintiff's requests are oppressive and would require unduly burdensome and costly efforts on the part of Dr. Berry in so far as they seek information or documents already in Plaintiff's possession or documents equally available to Plaintiff.

f.      Defendant Dr. Berry objects to each request to the extent he cannot determine the precise nature of the documents sought and, therefore, cannot answer without an unreasonable risk of inadvertently providing a misleading, confusing, inaccurate, or incomplete response.

g.      Defendant Dr. Berry objects to each request to the extent it calls for speculation, conjecture, legal opinion, or assumes the truth of facts not proven or facts not in evidence.

h.      Defendant Dr. Berry will produce information that is responsive to more than one discovery request only once; thus, information provided in response to one request is incorporated by reference to other requests to the extent the other request seeks such information.

i.      Defendant Dr. Berry objects to each request to the extent it purports to require him to provide duplicative and repetitious information already provided in response to other requests.

j.      Defendant Dr. Berry objects to each request to the extent it purports to require him to provide information when the burden of ascertaining the information is substantially the same for Plaintiff as it is for Defendant Dr. Berry.

k.      Defendant Dr. Berry objects to each request to the extent it purports to impose any obligation greater than those provided by the applicable law and rules governing the proper scope and extent of discovery.

- 2 -

$Ex. 165$

l.      Any failure to specifically mention a general objection in Defendant Dr. Berry's

responses, shall not be deemed a waiver of any objection to any request.

Without waiving the foregoing objections, Defendant Dr. Berry responds to Plaintiff's

requests as follows:

## REQUESTS FOR PRODUCTION

1.      All records of communications between Berry and transferee physician of the purported
Crisis Stabilization Center regarding transfer of plaintiff by Berry.

**RESPONSE: See General Objections.  Subject to and without waiving those objections,**

**Defendant Dr. Berry refers Plaintiff to the medical chart previously produced by Defendant**

**Mercy.**

2.      Copies of diplomas and or certificates from all educational and professional institutions
attended.

**RESPONSE: See General Objections.  Subject to and without waiving those objections,**

**Defendant Dr. Berry refers Plaintiff to his curriculum vitae attached to his expert report.**

3.      Copies of all licenses to practice medicine from Ohio and other local and foreign states or
countries where you have been licensed to practiced.

**RESPONSE: See General Objections.  Subject to and without waiving those objections, Dr.**

**Berry refers Plaintiff to his curriculum vitae attached to his expert report.**

4.      All of Berry's personal federal tax returns with schedules, for years 2000 to 2006.

**RESPONSE: See General Objections.**

5.      All you medical office corporate/business federal tax returns with schedules for years 200
to 2006.

**RESPONSE: See General Objections.**

6.      List and identification of specific witnesses with names, titles, positions, addresses and
subjects of testimonies.

$E_4. 166$

**RESPONSE: See General Objections. Subject to and without waiving those objections,**

**Defendant Dr. Berry refers Plaintiff to his Initial Disclosures previously provided. Defendant**

**Dr. Berry will supplement this response as may be required by the Federal and local civil rules**

**and the court's orders.**

7.    All records of communications between Berry and the Hospital relating to Plaintiff.

**RESPONSE: See General Objections. Subject to and without waiving those objections, Dr.**

**Berry refers Plaintiff to the medical chart previously produced by Defendant Mercy.**

8.    Copy of plaintiff's signed written informed consent for transfer to the purported Crisis
Stabilization Center.

**RESPONSE: See General Objections. Subject to and without waiving those objections,**

**Defendant Dr. Berry refers Plaintiff to the medical chart previously produced by Defendant**

**Mercy.**

9.    Documents reflecting all that you and or your qualified desginee told plaintiff in order for
him to make informed consent for transfer to Crisis Stabilization Center (CSC).

**RESPONSE: See General Objections. Subject to and without waiving those objections,**

**Defendant Dr. Berry refers Plaintiff to the medical chart previously produced by Defendant**

**Mercy.**

10.    Your signed "Doctor Certification for Patient-Plaintiff Transfer Order" to Crisis Stabilization
Center (CSC) showing execution sections, i.e., Patient Condition, Receiving Facility-CSC, Method
of Transfer, Reason for Transfer, Patient-Plaintiff Certification and Signature, Doctor's Certification
and Signature, and Summary of the risks and benefits upon which the certification is based.

**RESPONSE: See General Objections. Defendant Dr. Berry further objects to the extent this**

**request is an attempt by Plaintiff to impute liability or an obligation to execute such**

**document(s) on Defendant Dr. Berry. Subject to and without waiving those objections, Dr.**

**Berry refers Plaintiff to the medical chart previously produced by Defendant Mercy.**

E4. 167

 11.    The signed document or certification of the receiving facility-CSC showing available space and qualified personnel for the treatment of the plaintiff, agreement to accept transfer of plaintiff and to provide appropriate medical treatment.

**RESPONSE: See General Objections. Subject to and without waiving those objections,**

**Defendant Dr. Berry refers Plaintiff to the medical chart previously produced by Defendant**

**Mercy.**

12.    Copy of documentary evidence of transmission or sending plaintiff's medical records to and receipt thereof by CSC.

**RESPONSE: See Response to Request No. 11.**

13.    Copy of plaintiff's signed written informed consent for transmission or sending his medical record to CSC.

**RESPONSE: See Response to Request No. 11.**

14.    Copy of documentary evidence of date and time of the day of the transfer actual reception and acceptance of plaintiff by CSC's receiving physician or designated qualified medical staff.

**RESPONSE: See Response to Request No. 11.**

15.    Copy of the transcript of the deposition of plaintiff.

**RESPONSE: See General Objections.**

- 5 -

$Ex. 168$

16.    Copy of the policy of your medical liability insurance showing the amount of coverage.

**RESPONSE: See General Objections. Subject to and without waiving those objections,**

**Defendant Dr. Berry refers Plaintiff to his Initial Disclosures previously provided.**

Respectfully submitted,

*[signature]*

Deborah R. Lydon (0013322)
Jennifer Orr Mitchell (0069594)
Matthew S. Arend (0079688)
DINSMORE & SHOHL LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, OH 45202
(513) 977-8200
*Counsel for Defendant Dr. Berry*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **Response to Plaintiff's Requests for Production of Documents** was served by regular U.S. Mail, postage prepaid, this ____ day of ____ ____, 2006 upon the following:

Darlington Amadasu
P.O. Box 6263
Cincinnati, OH 45206

Karen A. Carroll, Esq.
Kohnen & Patton LLP
201 E. Fifth St., Suite 800
Cincinnati, OH 45202

*[signature]*

E4. 169

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DARLINGTON AMADASU, pro se | : | Case No.: C-1-01-182 |
| | : | |
| Plaintiff, | : | Judge S. Arthur Spiegel |
| | : | Magistrate Judge Timothy S. Black |
| v. | : | |
| | : | |
| MERCY FRANCISCAN HOSPITAL - | : | **DEFENDANT RAVI B. BERRY M.D.'S** |
| WESTERN HILLS, et al. | : | **RESPONSES TO PLAINTIFF'S** |
| | : | **INTERROGATORIES** |
| Defendants. | : | |
| | : | |

Defendant Ravi B. Berry, M.D. ("Defendant Dr. Berry"), hereby responds to Plaintiff

Darlington Amadasu's Interrogatories, pursuant to Federal Rule of Civil P. 33, as follows:

## **GENERAL OBJECTIONS**

Defendant Dr. Berry asserts the following general objections to Plaintiff's Interrogatories,

pursuant to Federal Rules of Civil Procedure 33 and 26(b):

a.      Defendant Dr. Berry objects to the extent these requests are vague, confusing,

incomprehensible, overbroad, compound, or seek information not calculated to lead to the discovery

of admissible evidence and seek to impose unwarranted burdens on him.

b.      Defendant Dr. Berry objects to Plaintiff's requests to the extent they seek to invade

the attorney-client privilege and work product protection to which he is entitled and/or other

privileges recognized by the law.

c.      Defendant Dr. Berry objects to the extent Plaintiff's requests seek confidential

information, particularly in the absence of an appropriate protective order to preserve the

confidentiality of such information.

$Ex. 170$

11/7/06

d.    Defendant Dr. Berry objects to certain of Plaintiff's requests because they seek information that is not a proper subject matter for interrogatories.

e.    Defendant Dr. Berry further objects to the extent Plaintiff's requests are oppressive and would require unduly burdensome and costly efforts on the part of Dr. Berry in so far as they seek information or documents already in Plaintiff's possession or documents equally available to Plaintiff.

f.    Defendant Dr. Berry objects to each request to the extent he cannot determine the precise nature of the information sought and, therefore, cannot answer without an unreasonable risk of inadvertently providing a misleading, confusing, inaccurate, or incomplete response.

g.    Defendant Dr. Berry objects to each request to the extent it calls for speculation, conjecture, legal opinion, or assumes the truth of facts not proven or facts not in evidence.

h.    Defendant Dr. Berry will produce information that is responsive to more than one discovery request only once; thus, information provided in response to one request is incorporated by reference to other requests to the extent the other request seeks such information.

i.    Defendant Dr. Berry objects to each request to the extent it purports to require him to provide duplicative and repetitious information already provided in response to other requests.

j.    Defendant Dr. Berry objects to each request to the extent it purports to require him to provide information when the burden of ascertaining the information is substantially the same for Plaintiff as it is for Defendant Dr. Berry.

k.    Defendant Dr. Berry objects to each request to the extent it purports to impose any obligation greater than those provided by the applicable law and rules governing the proper scope and extent of discovery and because the Interrogatories exceed the number allowed by the Federal rules.

- 2 -

$Ex. 171$

l. Any failure to specifically mention a general objection in Defendant Dr. Berry's responses shall not be deemed a waiver of any objection to any request.

Without waiving the foregoing objections, Defendant Dr. Berry responds to Plaintiff's requests as follows:

## INTERROGATORIES



**INTERROGATORY NO. 1:** Prior to answering these Interrogatories, have you made due and diligent search of defendant's books, records, papers, plaintiff's medical records, articles and treatises in the clinical medical, psychiatric, psychological and regulatory texts, literatures and or journals, medical and psychiatric texts relating to the care and treatment of the plaintiff by you?

**RESPONSE: See General Objections. Defendant Dr. Berry further objects to the extent Plaintiff intends to imply that a search and review of all the listed materials is necessarily required by Defendant Dr. Berry prior to his responding to these Interrogatories. Subject to and without waiving those objections, Defendant Dr. Berry is properly responding to these Interrogatories.**

**INTERROGATORY NO. 2:** Do you keep up with developments in general medical fields and in your specialty by subscribing, buying, referencing, and reading any medical and psychiatric texts, literatures, journals, treatises, magazines, newsletters, circulars. or other similar professional publications? If your answer is in the affirmative, please list by author, title, publisher, or publication and edition of the texts, treatises, articles, and other works which you regarded at the time of treating plaintiff as authoritative in your field of specialty, in the evaluation and treatment of plaintiff's medical and psychiatric illnesses and conditions, in informed consent principle, and in transfer of patient.

**RESPONSE: See General Objections. Defendant Dr. Berry also objects to Plaintiff's characterization of any source of information as "authoritative" and states that his treatment of Plaintiff comported with the applicable standard(s) of care. Subject to and without waiving those objections, Defendant Dr. Berry maintains knowledge of all recent and relevant developments in fields related to his practice of psychiatry.**

E4. 172

**INTERROGATORY NO. 3:** Please state the nature and substance of your relationship with Mercy Franciscan Hospitals, including whether you are employee, independent contractor, title, and position.



**RESPONSE:** See General Objections. Subject to and without waiving those objections,

**Defendant Dr. Berry was a physician with privileges at Defendant Mercy at the time he treated**

**Plaintiff and was the psychiatrist on call when Plaintiff was admitted through the Emergency**

**Department.**



**INTERROGATORY NO. 4:** Please recite completely the details of your professional work and experience, including in your answer a detailed description of the nature and scope of your experience, a complete bibliography of all published medical and psychiatric articles, books, treatises and papers, which you have authored, co-authored, edited, or made a contribution to, which deal with the treatment of care for which you were attending to the plaintiff during the relevant times, and for each such article, book, treatise, or paper state the title, date, publisher, nature and scope of your contribution, a description of your area of specialization, the nature of relationship with, and scope of your clinical privileges at, Mercy Franciscan Hospital.

**RESPONSE:** See General Objections. Subject to and without waiving those objections,

**Defendant Dr. Berry refers Plaintiff to his curriculum vitae attached to his expert report.**



**INTERROGATORY NO. 5:** If you have ever been a defendant in a malpractice suit other than the present one, please identify the case by name, court and trial docket number, indicate the substance of the allegations against you and state the outcome of the case including terms of any settlement.

**RESPONSE:** See General Objections. Subject to and without waiving those objections, Dr.

**Berry has previously been named as a defendant in the following cases, non-confidential**

**documents relating to which are publicly available:**

- *Alcorn, et al. v. Franciscan Hospital Mt. Airy Campus, et al.*, Case No. A0104651, **Hamilton County Court of Common Pleas (Currently pending).**

- *Jacqueline Chesher, et al. v. Mercy Franciscan, et al.*, Case No. A0207177 Hamilton **County Court of Common Pleas (Dismissed).**



**INTERROGATORY NO. 6:** Please describe fully the circumstances under which you first came into contact with the plaintiff with regard to the problem for which you were attending the plaintiff and indicate the date and time of day thereof, and state all you told plaintiff on the first day of contact.



**RESPONSE:  See General Objections.  Subject to and without waiving those objections,**

**Defendant Dr. Berry refers Plaintiff to the medical chart produced previously by Defendant**

**Mercy.**



**INTERROGATORY NO. 7:**  Please describe the state of the plaintiff's health, illnesses and conditions at the time of his discharge, transfer and the termination of your professional relationship with the plaintiff including in your description the differential diagnosis of each of the complaints, conditions, illnesses, or injuries the plaintiff had at the time.

**RESPONSE:  See Response to Interrogatory No. 6.**



**INTERROGATORY NO. 8:**  Did you disclose to anyone, among others, Cincinnati Police, Mercy F. Hospital (MFH) security agents, any kind of information about the plaintiff that you had learned as a result of your professional relationship with the plaintiff or otherwise?  If you answer in affirmative please state in detail

    (a)    date, time of the day and substance of what you disclose to Cincinnati Police
    (b)    date, time of the day and substance of what you disclose to MFH security agent
    (c)    date, time of the day and substance of what you disclose to any other person
    (d)    the name, occupation, title, address, and professional relationship to you, if any, of each person to whom you disclosed,
    (e)    exact nature and scope of disclosure
    (f)    the manner in which you learned the particular piece of information involved,
    (g)    the context in which it was made,
    (h)    your **reasons** *for* making it
    (i)    bases and evidence if you contend the disclosures were true

**RESPONSE:  See General Objections.  Subject to and without waiving those objections,**

**Defendant Dr. Berry does not presently recall making any of the disclosures described in this**

**Interrogatory beyond disclosures made to those with a need to know (e.g., the treatment team).**

**In addition, Defendant Dr. Berry states that any information he may have disclosed about**

**Plaintiff was permitted to be disclosed.**



**INTERROGATORY NO. 9:**  If it is your contention that the plaintiff gave informed consent for transfer to Crisis Stabilization Center please indicate:

    (a)    the date and time of the consent was given,
    (b)    the name, occupation, title, address, and professional relationship to you of the person who obtained the informed consent.

Ex. 17y

    (c)    the substance of what was communicated and disclosed to the plaintiff prior to the consent with regard to the contemplated transfer,

    (d)    the manner in which the consent was communicated to you and action thereon

    (e)    whether it was in writing, and if so, the name and address of the person who presently had custody of the written informed consent document [please attach a copy to your answer]

    (f)    the names and addresses of all those present at the time of the consent

**RESPONSE:  See Response to Interrogatory No. 6.**

**INTERROGATORY NO. 10:**  Please state in complete detail the plaintiff's **medical** and **psychiatric** histories including chief complaints, history of present illnesses, past history, family history, review of systems, personal or social history, diagnosis as you received it or otherwise knew it to be on the occasion of your first contact with the plaintiff with regard to the problem for which you were attending to the plaintiff as you subsequently learned it to be. Please completely identify the source of each fact in the medical history and indicate the date you receive it.

**RESPONSE:   See General Objections.   Defendant Dr. Berry further objects to this**

**Interrogatory, including all discrete subparts, because it exceeds the number allowed by**

**Federal Rule of Civil Procedure 33(a).**

**INTERROGATORY NO. 11:**  Concerning plaintiff's complaint of **respiratory problems** such as shortness of breath, chest tightness, for which you prescribed medication(s): as to each occasion of your first and subsequent contacts with him as inpatient please describe in complete detail

    (a)    the accepted standard of care for patients presenting with such respiratory problems

    (b)    symptoms and history given by plaintiff and take by you with the date and time of day taken on each occasion

    (c)    the nature and scope of each physical examination that you performed on the plaintiff on first and subsequent occasions and submit in comprehensive list of your findings.

    (d)    all diagnostic tests and procedures which were done and submit the results of each test, all actions you took as a result of the test and everything you told the plaintiff concerning the results of the test.

    (e)    the substance of all conversations which you had with the plaintiff in course of your treating him

    (f)    all consultation requests to pulmonary/respiratory specialists and identify by name, specialization, title, address, and professional relationship to you of such specialists

    (g)    all treatment orders by you

    (h)    the course and the progression of the plaintiffs symptoms and signs from the time you first took up treatment to when you stop treating it.

Ex. / 75

**RESPONSE:**   **See Response to Interrogatory No. 10.**

**INTERROGATORY NO. 12:** At any time during your care of the plaintiff for the problem for which you were attending to the plaintiff, did you form the opinion or diagnosis that the plaintiff had developed **diarrhea** or an **infection of the digestive system**? If your answer is in the affirmative, please describe in complete detail or state:

    (a)    the accepted standard care for patients presenting with diarrhea or gastro-intestinal problem

    (b)    symptoms and history given by plaintiff and taken by you with the date and time of day taken on each occasion

    (c)    the nature and scope of each related physical examination that you performed on the plaintiff on first and subsequent occasions and submit a comprehensive list of your findings.

    (d)    all diagnostic tests and procedures which were done and submit the results of each test, all actions you took as a result of the test and everything you told the plaintiff concerning the results of the test.

    (e)    the substance of all conversations which you had with the plaintiff in course of your testing it

    (f)    all consultation requests to infectious diseases and or gastroenterological specialists and identify by name, specialty, title, address, and professional relationship to you of such specialists

    (g)    all treatment and tests ordered by you

    (h)    the course and the progression of the plaintiffs symptoms and signs from the time you first took up treatment to when you stop treating it.

    (i)    the date and time of day you formed such an opinion or diagnosis,

    (j)    what your initial opinion or diagnosis was as to the site, nature of the infection (i.e., diarrhea, enteritis, etc.), the etiology and or organism responsible for the condition and the data on which you based this opinion, and

    (k)    the steps you took to obtain positive identification of the causes and the organism responsible.

**RESPONSE:**   **See Response to Interrogatory No. 10.**

**INTERROGATORY NO. 13:** At any time during your care of the plaintiff for the problem in #12 for which you were attending to the plaintiff, did this plaintiff take or receive a course of antibiotic, anti-infective therapy, any medication or other substance for the treatment or relief of the symptoms of the plaintiffs condition? If you answer is in the affirmative, please state as to each such course of medication:

    (a)    the name, amount and route of administration of each dose of medication taken or received by the plaintiff, and the date and time of day the plaintiff took or received each such dose,

- 7 -

$E4176$

(b)     the name, occupation, title, address, and professional relationship to you of the
        person who ordered or prescribed the course of therapy for the plaintiff and of the
        person who administered each dose of antibiotic,

(c)     the data on which was based the determination that the particular antibiotic or
        combination of medications that was used was the optimum one under the
        circumstances,

(d)     whether prior to its initiation the specimen or specimens for culture and sensitivity
        had been obtained from the plaintiff's body and excrement and it not, why whey
        had not been,

(e)     the degree to which it accomplished the purpose for which it had been prescribed
        or ordered and the data on which you are basing this opinion, and

(f)     whether there was any abatement or relief from the symptoms following their
        administration.

(g)     the date and time of day it was determined and the reasons for its termination at
        that particular time.

**RESPONSE:     See Response to Interrogatory No. 10.**

**INTERROGATORY NO. 14:** Concerning plaintiff's complaint of **uro-genital problems** such
as his scrotal swelling as to each occasion of your first and subsequent contacts with him please
describe in complete detail

(a)     the accepted standard of care for patients presenting with such scrotal swelling

(b)     symptoms and history given by plaintiff and taken by you with the date and time
        of day taken on each occasion

(c)     the nature and scope of each examination that you performed on the plaintiff on
        first and subsequent occasions and submit a comprehensive list of your finds.

(d)     all diagnostic tests and procedures which were done and submit the results of each
        test, all actions you took as a result of the test and everything you told the plaintiff
        concerning the results of the test.

(e)     the substance of all conversations which you had with the plaintiff in course of
        your treating him

(f)     all consultation requests to urologist and or other related specialists and identify
        by name, specialty, title, address, and professional relationship to you of such
        specialists.

(g)     all treatment orders by you

(h)     the course and the progression of the plaintiff's symptoms and signs from the time
        you first took up treatment to when you stop treating it.

**RESPONSE:     See Response to Interrogatory No. 10.**

- 8 -

Ex. 177

**INTERROGATORY NO. 15:** Concerning plaintiff's complaint of **mental and or psychiatric problems as** to each occasion of your first and subsequent contacts with him please describe in complete detail

- (a) the accepted standard of care for patients presenting with such mental and or psychiatric conditions
- (b) history, including psychiatric history, medical history, physical illnesses history, all complaints, history of present mental condition or illness, past history, family history, review of symptoms, personal or social history as you received it or otherwise knew it to be on the occasion of your first and later contacts with the plaintiff with regard to the mental conditions for which you were attending the plaintiff
- (c) the nature and scope of each examination that you performed on the plaintiff on first and subsequent occasions and submit a comprehensive list of your findings
- (d) all diagnostic laboratory tests and procedures and submit the results of each t3st, all sections you took as a result of the test and everything you told the plaintiff concerning the results of the test.
- (e) all psychological and projective tests and procedures which were done and submit the results of each test, all actions you took as a result and everything you told the plaintiff concerning the results of the test.
- (f) the substance of all conversations and participations which you and the plaintiff had regarding the treatment planning and discharge in course of your treating him
- (g) all consultation requests to other medical specialists regarding plaintiff's presenting medical and or physical illnesses (i.e., respiratory, urino-genital and gastroenterological illnesses and symptoms) and identify by name, specialty, title, address, and professional relationship to you of such specialists
- (h) all treatment plans and orders by you
- (i) whether there was any abatement or relief from the symptoms following treatment.
- (j) the course and the progression of the plaintiff's symptoms and signs from the time you first took up treatment to when you stop treating it.

**RESPONSE:    See Response to Interrogatory No. 10.**

**INTERROGATORY NO. 16:** Did you ever perform any of the following tests or procedures on the plaintiff:

- (a) Henet-type intelligence test,
- (b) Rorschack Psychodiagnostic test,
- (c) Wechsler-type test,
- (d) Thematic Apperceptions test,
- (e) Blacky pictures, test,
- (f) Gestalt test,
- (g) Goodenough Intelligence test,
- (h) figure drawings or house-Tree-Person drawing test,
- (i) word association test,

Ex. 178

      (j)      sentence completion test,

      (k)     Minnesota Multiphasic Personality Inventory?

If you answer is in the affirmative, please state for each such test or procedure performed:

      (a)     the date and time of each test was performed,

      (c)     the results of the test,

      (d)     all actions you took as a result of the tests,

**RESPONSE:**   **See Response to Interrogatory No. 10.**

**INTERROGATORY NO. 17:**  Please list the exact number of treatment and discharge planning sessions that plaintiff participated in and transpired during the period of inpatient treatment, listing for each such session:

      (a)     the exact location, the date and time of day of each session,

      (c)     the reason(s) for the session,

      (d)     the name and address of any person, including support staff, that have participated, witnessed or any have been in the vicinity of any part before, during or after the session,

      (d)     your opinion as to the progress and discharge of plaintiff after the session,

      (e)     any change of therapy instituted at the session, including but not limited to drug therapy, and your reason for making such a change,

      (f)     whether the session departed from a standard treatment planning, therapeutic course given the nature of plaintiff's illness, and if so, why,

      (g)     the existence of any written notes or recorded duplications of each session,

      (h)     all incidents that occurred during each session.

**RESPONSE:**   **See Response to Interrogatory No. 10.**

**INTERROGATORY NO. 18:**  Concerning the transfer of a patient from one medical care provider to another (physician and medical facility) please state:

      (a)     professional definition of an appropriate transfer of a patient

      (b)     the accepted standard of care for transfer

      (c)     the required steps, components, procedures and phases that must be satisfied to meet the standard

**RESPONSE:**   **See Response to Interrogatory No. 10.**

Ex. 179

**INTERROGATORY NO. 19:** Are you knowledgeable about, familiar with and adherent to the statutory, regulatory, and professional standard of care for transfer of patient established by:

- (a)    Mercy Franciscan Hospital (MFH) policies, procedures, rules, regulations and guidelines ("Bylaws")
- (b)    Joint Commission on Accreditation of Healthcare Organizations (JCAHO)
- (c)    American College of Emergency Physicians (ACEP)
- (f)    Section 9121 of Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA") Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 USC 1395 et seq. or Section 1867 of the Social Security Act. Collectively ("COBRA, EMTALA, or ANTI-DUMPING LAW")
- (g)    American Medical Association ("AMA")
- (h)    American Psychiatric Association ("APA")
- (i)    Ohio Mental Health law (OHMHL) and Ohio Administrative Code (OAC) - Anti-dumping law

If your answer is in the affirmative, please state a summary of the standard of care for transfer of each of those bodies

**RESPONSE:    See Response to Interrogatory No. 10.**

**INTERROGATORY NO. 20:** Regarding **"informed consent"** of a patient **and** plaintiff please state

- (a)    definition of what 'informed consent' of a patient is
- (b)    the professional standard of care for informed consent generally, and disclosure specifically
- (c)    Ohio informed consent law and MFH informed consent policy and procedure as you know it
- (d)    elements, components or requirements fundamental to the concept
- (c)    whether the consent purportedly obtained from plaintiff for transfer was 'informed" and
- (d)    how and why the consent purportedly obtained satisfied the fundamental requirements of the concept

**RESPONSE:    See Response to Interrogatory No. 10.**

**INTERROGATORY NO. 21:** Concerning the purported Crisis Stabilization Center (CSC), please state and or describe in complete detail.

- (a)    the nature of organizational structure of the medical and non-medical staff of CSC
- (b)    the nature of room, sleeping-bed arrangement and boarding facilities of CSC
- (b)    nature and availability of facilities for providing medical and psychiatric evaluations, diagnosis, treatment and services of CSC
- (c)    characteristics of patients indicative of transfer to CSC
- (d)    type and nature of crisis, illnesses and conditions indicative of transfer to CSC

- 11 -

*Ex. 180*

    (e)     the data upon which determination and decision to transfer are based and how the data are obtained

**RESPONSE:**   **See Response to Interrogatory No. 10.**

**INTERROGATORY NO. 22:** Concerning the transfer of plaintiff from Mercy Franciscan Hospital (MFH) to the purported Crisis Stabilization Center (CSC), please state and or describe in complete detail

    (a)     each required step and procedure you executed; how, how and when executed with the date and time of the day in every phase of the transfer

    (b)     the manner, mode and means of the transfer'

    (c)     the substance of all communications, discussions and disclosures made to elicit informed consent, or how and when plaintiff was 'informed' in order to give 'informed consent' to transfer

    (d)     whether plaintiff into the characteristics of patient and type of crisis and illnesses indicative of being transferred to CSC and set forth the data upon which you based on your determination to transfer

    (e)     type and nature of plaintiff's crisis, if any, indicative of being transfer to CSC and data on which based

    (f)     Whether plaintiff's medical record was transferred to CSC and to whom under plaintiff's authorization

    (g)     if the steps, procedures and processes executed by you or your designee in the transfer conform to the accepted professional and statutory standard of care for transfer established by MFH, JCAHO, ACEP, "COBRA, EMTALA, or ANTI-DUMPING LAW", APA, AMA, so state your bases

**RESPONSE:**   **See Response to Interrogatory No. 10.**

**INTERROGATORY NO. 23:** At the time you agreed to care for the plaintiff for the illnesses or conditions for which you were treating the plaintiff, did you inform the plaintiff of any limitation upon the type, scope, or special medicine you were licensed, qualified or willing to practice in your relation with the plaintiff? If your answer to the preceding interrogatory is in the affirmative, please state for each such limitation:

    (a)     a description of the limitation,

    (b)     the date and time of day you informed the plaintiff of the limitation,

    (c)     what the plaintiff s response was, and

    (d)     any reasons for the limitation

    (f)     if your answer is in the negative, state why you did not perform medical history, examination and diagnostics of plaintiff's medical or physical illnesses

**RESPONSE:**   **See Response to Interrogatory No. 10.**

E4./8/

**INTERROGATORY NO. 24:** If you did not ask another specialist or member of the health care profession for an opinion or for assistance with the plaintiff's medical conditions, other than psychiatric condition, what were your reasons for not seeking such consultations?

**RESPONSE:   See Response to Interrogatory No. 10.**

**INTERROGATORY NO. 25:** Is the standard of care usually highly correlate with professionally accepted clinical medical and psychiatric texts, literatures, journals, treatises, magazines, circulars, guidelines, or other similar professional publications, and clinical training programs? If "Yes" so state; if "No", state basis of your "No".

**RESPONSE:   See Response to Interrogatory No. 10.**

Respectfully submitted,

Deborah R/Lydon (0013322)
Jennifer Orr Mitchell (0069594)
Matthew S. Arend (0079688)
DINSMORE & SHOHL LLP
1900 Chemed Center
255 East Fifth Street
Cincinnati, OH 45202
(513) 977-8200
*Counsel for Defendant Dr. Berry*

Reed   11/11/06

- 13 -

E+./82

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **Response to Plaintiff's Interrogatories** was served by regular U.S. Mail, postage prepaid, this day of _Nov._ 2006 upon the following:

Darlington Amadasu
P.O. Box 6263
Cincinnati, OH 45206

Karen A. Carroll, Esq.
Kohnen & Patton LLP
201 E. Fifth St., Suite 800
Cincinnati, OH 45202

*Quimber An Mitchell*

1320793v1

- 14 -

Ex. 183

## AUTHORIZATION TO RELEASE ALL MEDICAL, HOSPITAL, PSYCHIATRIC AND OTHER RECORDS

You, _____, are hereby authorized to furnish and release to <u>Deborah R. Lydon, Jennifer M. Orr and/or any representative of the law firm of DINSMORE & SHOHL LLP, 1900 Chemed Center, 255 E. Fifth Street, Cincinnati, Ohio 45202-4797,</u> all medical and other information and records concerning:

### DARLINGTON AMADASU,

including itemized bills, medical reports, complete hospital records, and/or office records including, without limitation, nurses' notes, x-ray reports and films, photographs, diagnostic test, order sheets, physician's progress notes, history and physical examination documentation, medications sheets, laboratory reports, testing or treatment of any and all conditions, disabilities, information concerning HIV testing or treatment of AIDS, AIDS-related conditions, drug or alcohol abuse, drug related conditions and/or psychiatric or psychological conditions, and all other summaries or records covering findings related and treatment rendered to the above-referenced individual.

This authorization is also effective to authorize the disclosure of any and all other records of any nature pertaining to **Darlington Amadasu**, including, but not limited to, any and all wage records, employment records, Social Security Administration records, Internal Revenue Service records, Ohio Department of Taxation records, Ohio Department of Workers' Compensation records, and all education records.

This authorization includes the right to inspection and copying. I further release any health care provider or employer of mine from any and all liability for furnishing said information to the aforesaid attorneys and law firm. A copy of this release shall be considered an original and, as such, you are authorized to comply with any request for information as delineated herein, upon presentation (via fax, mail or hand delivery) of a signed original or copy of this authorization.

DATE: _____

Darlington Amadasu

ADDRESS: _____

Ex. 184

## AUTHORITY TO RELEASE RECORDS AND INFORMATION

TO:

I, **Darlington Amadasu**, hereby authorize _____
     (Print full name)                    (Print/type name of agency/facility/provider)
to furnish and release to Deborah R. Lydon, Jennifer M. Orr, and the law firm of Dinsmore & Shohl, LLP
1900 Chemed Center, 255 East Fifth Street, Cincinnati, Ohio 45202, retained experts, and Co-Defendants'
counsel in this case, copies of, **or** permit the review and inspection of, the hospital, medical, psychological,
psychiatric, or psychosocial records and/or other information (including billing records) concerning the
treatment of **Darlington Amadasu**, D.O.B. ████████████████, including but not limited to any
information or records concerning drug abuse or drug-related conditions, and/or alcoholism, and/or HIV-
status or AIDS infection. Such records include, but are not limited to, the following:

| | | | |
|---|---|---|---|
| __ | Treatment Plan | __ | Progress Notes |
| __ | Termination and/ | __ | Order sheets |
| | or discharge summary | __ | History and Examination |
| __ | Medication sheets | __ | Psychiatric evaluation, treatment and notes |
| __ | Psychological evaluation, | __ | Nursing evaluation, treatment and notes |
| | treatment and notes | __ | Laboratory and/or test results |
| __ | Psychosocial and/or family | X | **Complete records without limitation** |
| | evaluation, treatment and notes | | **(including all of the foregoing)** |

Purpose of the disclosure:   Civil litigation (Case No. C-1-01-182), (United States District Court,
                                 Southern District of Ohio, Western Division at Cincinnati)

I understand that my consent may be revoked at any time except to the extent that action has been taken in
reliance thereon. This consent will expire sixty (60) days after the date below, or on _____,
whichever is earlier. I understand that I may revoke this authorization at any time, in writing, with revocation
delivered to the Medical Records Department or Records Custodian of the agency/person to whom this
release is addressed. The revocation must include the signature of the patient or the patient's parent/legal
guardian and the date signed to be effective.

Date:_____

_____
Darlington Amadasu

01/01/49 _____
Date of Birth

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 _____
Social Security Number

$Ex. 185$

1for the department.   The director may delegate this listing to the
2appropriate section directors.

### RULE #7

4    The position of representative to the hospital medical staff
5section of the AMA is the responsibility of the president of the
6medical staff at each campus.   This responsibility may be
7delegated to an active member of the medical staff who is a member
8of the AMA.

### RULE #8

10    Employees of medical staff members who work in the hospital
11must abide by the Ohio Department of Health recommendations for
12HIV/HBV infected healthcare workers.

13

14                          **General Conduct of Care**

15                                **100-199**

### RULE #100

17    All orders for treatment must be in writing.   Orders shall be
18considered to be written when dictated to and transcribed by an
19authorized professional, as defined by the medical executive
20committee.   Professional personnel from the following departments
21have been given the authority to receive verbal orders relating to
22their specific area of responsibility:   registered nurses,
23licensed practical nurses (skilled nursing unit only), respiratory
24therapists, pharmacists, physical therapists, speech pathologists,
25occupational therapists, social service workers, dietitians, and
26technicians from radiology, laboratory, cardiology, nuclear

4

$Ex. 186$

1medicine and ultrasound.  Clerks from the admitting/registration
2and diagnostic departments may receive routine outpatient orders
3for tests.

4      Orders dictated over the telephone must be signed and dated
5by the person to whom dictated over the name of the ordering
6physician.  Verbal orders which constitute major therapy or for
7medication or laboratory tests, i.e., blood, respiratory therapy,
8intravenous therapy, antibiotics, cardiac glycosides and
9chemotherapy, must be countersigned by the physician in charge
10upon completion of the medical record and in compliance with
11medical staff requirements on medical record delinquency.

12     Verbal orders for patient restraints are authenticated by
13either the ordering or the covering physician within 24 hours.

14

15                    **Admission & Discharge**

16                         **200-299**

17**RULE #200**

18     Registered nurses in the emergency department are authorized
19to perform medical screening in consultation with a physician from
20the department of emergency medicine.  Registered nurses in the
21obstetrical unit are authorized to perform medical screening in
22consultation with an obstetrical care provider.

23

24                       **Medical Record**

25                         **300-399**

26**RULE #300**

5

$Ex. /87$

1  A complete history and physical examination shall be
2performed within 24 hours after admission.  With the exception of
3patients who are a class I or II anesthesia risk, histories and
4physicals may be performed only by a licensed doctor of medicine
5or osteopathy.  Qualified oral surgeons may complete the history
6and physical examination for patients who are a class I or II
7anesthesia risk.

8  If a complete history and physical examination have been
9performed by a member of the medical staff within 30 days prior to
10the patient's admission to the hospital, a legible copy of these
11reports may be used in the patient's hospital medical record in
12lieu of the admission history and physical examination. If any
13changes in the patient's status have occurred in the time frame
14between the completion of the history and physical examination and
15the admission, an interval admission note should be included on
16the medical record.

17**RULE #301**

18  For inpatients in the acute care areas the attending
19physician shall add legible progress notes to the patient's
20medical record at least every two days or sooner if the condition
21of the patient changes.  For inpatients in the skilled nursing
22unit the attending physician shall add legible progress notes to
23the patient's medical record at least every seven days or sooner
24if the condition of the patient changes.  Daily legible physician
25progress notes shall be written during the patient's stay in the
26ICU and CCU.  Progress notes should be signed and dated.

6

$Ex. 188$

1**RULE #302**

2    A consultation includes examination of the patient and the
3record.  A written opinion, signed by the consultant, must be
4included in the medical record.  When operative procedures are
5involved, the consultation note, except in emergency, shall be
6recorded prior to the operation.

7**RULE #303**

8    In order for a patient to be transferred from the care of one
9practitioner to another, the practitioner who will be assuming the
10care of the patient must agree to the transfer prior to the actual
11transfer itself.  A note covering the transfer of responsibility
12shall be recorded in the progress notes or on the order sheet of
13the medical record by the practitioner transferring the
14responsibility.

15**RULE #304**

16    Medical records are to be completed at the time of discharge.
17 If not completed at that time, physicians will be so notified and
18will be allowed fifteen (15) days after the patient's discharge to
19complete the medical record.  Records not completed within 30 days
20following the patient's discharge will   result in temporary
21suspension of admitting privileges (elective and urgent) until
22such time as all delinquent records are complete.  (For the
23purpose of this section, delinquent records are those not
24completed within the prescribed time period.)

25    Upon notification by the medical record department of
26delinquency in completion of the operative report, the

7

$Ex. 189$

1 practitioner will not be permitted to schedule surgery (elective
2 and urgent) until the operative report(s) in question is
3 completed.

4      Upon notification by the medical record department of
5 delinquency in completion of the invasive procedure report, the
6 practitioner will not be permitted to schedule similar invasive
7 procedures (elective and urgent) until the invasive procedure
8 report(s) in question is completed.

9      Failure to complete any patient's medical record within
10 thirty (30) days after the practitioner is sent written
11 notification of suspension due to delinquent medical records
12 constitutes a resignation from the medical staff.

13 **RULE #305**

14     A discharge summary shall be completed for patients who are
15 hospitalized over 48 hours and shall be signed by the responsible
16 practitioner.

17     A transfer summary may be substituted for the discharge
18 summary if the patient is transferred to a different level of
19 hospitalization or residential care within the organization.

20     For anything less than 48 hours, a final progress note is
21 sufficient.

22

23                    **General Rules of Surgical Care**

24                              **400-499**

25 **RULE #400**

26     The acknowledgement of consent form shall be completed and

8

$\mathcal{E}4.190$

1care of the patient.

2

3                         **PATIENT RIGHTS**

4                            **500-599**

5**RULE #500**

6      The medical staff supports, reviews and advises the hospital
7on issues relating to patient rights as directed by the mission of
8the hospital and the statutes of the state of Ohio.  Major issues
9of patient rights are reviewed through the multi-disciplinary
10ethics committee.

11     Members of the medical staff will comply with the corporate
12policy regarding patient rights, which includes, but is not
13limited to:

14     - Reasonable access to care.

15     - Considerate (and respectful) care that respects the
16       patient's personal value and belief systems.

17     - Informed participation in decisions regarding the patient's
18       care.

19     - Participation in the consideration of ethical issues that
20       arise in the provision of the patient's care.

21     - Personal privacy and confidentiality of information.

22     - Designation of a representative decision-maker in the event
23       the patient is incapable of understanding a proposed
24       treatment or procedure or is unable to communicate his or her
25       wishes regarding care.

26

10

Ex. 191

# Guidelines for Psychiatric Practice in Public Sector Psychiatric Inpatient Facilities

*These guidelines were prepared by the Committee on State and Community Psychiatry Systems[1] of the Council on Psychiatric Services. They were approved by the Board of Trustees in December 1993.*

These guidelines deal with an important subject that directly affects the mental health care delivery system and its impact on the many Americans who receive care at public sector psychiatric inpatient facilities throughout the country. The American Psychiatric Association (APA) is committed to the principle that the provision of quality services should be the overriding goal in the delivery of care and treatment to all patients suffering from mental illness. While APA believes that the training and experience of any health care provider obviously has an important relationship to this goal, it nevertheless recognizes that the decision as to how best to provide quality care in a particular public psychiatric inpatient facility must ultimately be made by that facility's governing board, subject to any limitations imposed by state or federal law. In particular, this report focuses on the appropriate provision of psychiatric services in such settings and is not intended to define or describe the role of nonpsychiatrists. Any facility that relies on this report should assure that it has made an independent decision to do so on the basis of its own needs and policies, ultimately ascertained and developed by its governing board.

## RATIONALE FOR GUIDELINES

Psychiatric care in inpatient facilities is delivered through the combined expertise of multidisciplinary teams that include, among others, nurses, psychiatrists, psychologists, and social workers. The multidisciplinary approach is vital to the provision of comprehensive care within these settings. The effective delivery of this care requires both mutual appreciation of each discipline's special expertise and full interdisciplinary cooperation. Whenever possible, patients and families should be involved in treatment and discharge planning.

Several factors, outlined in the following, affect the role of psychiatrists working in state hospitals, and these guidelines set forth APA's view of the appropriate role of psychiatrists in public sector psychiatric inpatient facilities.

1. Public sector psychiatric inpatient facilities are health care organizations that diagnose and treat acutely and chronically mentally ill patients with the most severe disorders.

2. The care of these patients is a specialized area that requires a high level of expertise.

3. Mentally ill patients require comprehensive differential diagnostic evaluation, comprehensive and integrated treatment planning, and medical management in all three of the biological, psychological, and social spheres.

4. Medical problems frequently complicate the psychiatric problems of this patient population, requiring prompt diagnosis, treatment, and management.

5. The treatment of mentally ill patients in inpatient facilities requires medical management that frequently includes the prescription of medication and other somatic therapies, which often require physi-

cal and physiological preparatory workup and continued monitoring for side effects and toxicity.

6. Practitioners of the medical specialty of psychiatry have the medical training and skills needed to evaluate physical problems as well as their relationship to psychological and social phenomena.

7. The physician is usually held legally responsible for the medical/psychiatric care provided in his or her delivery system and should have authority appropriate to that responsibility.

It is clear, therefore, that to ensure quality care for patients with severe mental illness, a public sector psychiatric inpatient facility must provide appropriate psychiatric services for patients. To further this goal, APA recommends that ultimate responsibility for the clinical care of patients in such facilities be given to a psychiatrist medical/clinical director who is fully trained and qualified to provide appropriate supervisory oversight with respect to diagnosis, treatment planning, and clinical services for all patients.

## MODEL JOB DESCRIPTIONS FOR PUBLIC PSYCHIATRIC INPATIENT FACILITIES

### Medical/Clinical Director or Chief Medical Officer

The medical/clinical director or chief medical officer must be a qualified psychiatrist with the authority to provide clinical oversight for a public sector psychiatric inpatient facility. The specific responsibilities include the following.

1. Assuring that all facility patients receive appropriate medical/psychiatric evaluation, diagnosis, and treatment.

2. Assuring that clinical staff receive appropriate clinical supervision.

3. Overseeing the work of all physicians and medical trainees.

4. Assuring the appropriate implementation of clinical staff development and staff training activities.

5. Overseeing the recruitment of physicians.

6. Reviewing and approving all clinical policies and procedures on a regular basis.

7. Overseeing quality improvement and monitoring activities.

8. Overseeing all research efforts.

9. Assuring the appropriate privileging and performance review of physicians and, through a multidisciplinary process, all other clinical staff.

10. Collaborating with the chief executive officer in a) strategic planning, b) relating to the governing body, and c) communicating with the state mental health program director's office.

11. Providing liaison for the facility with community physicians and other professionals and agencies with regard to psychiatric services, particularly with regard to assuring continuity of patient care.

12. Assuring the development and maintenance of all educational programs; public-academic liaison should be fostered.

By licensure, training, and prior clinical and administrative experience, the medical/clinical director or chief medical officer should be qualified to carry out these functions. The medical/clinical director or chief medical officer must be board certified or board qualified. Specifically, he or she should be knowledgeable about contemporary therapeutic and rehabilitative modalities necessary in working with the population served by the program. This position is a full-time responsibility but is not intended to preclude participation in state-academic collaborations.

### Staff Psychiatrist (Full- or Part-Time)

The staff psychiatrist has authority and responsibility for psychiatric services of the division assigned to him or her by the medical/clini-

---

[1]The committee includes Steven Edward Katz, M.D. (chairperson), Cheryl Singleton Al-Mateen, M.D., Gordon H. Clark, Jr., M.D., Lois Talbot Flaherty, M.D., Stuart L. Keill, M.D., Jacob Schur, M.D., James M. Trench, M.D., Harriet Lefley, Ph.D. (consultant), Harry Schnibbe (consultant), Seymour Gers, M.D. (Assembly liaison), and J. Randolph Swartz, M.D. (APA/Burroughs Wellcome Fellow).

Ex. 192

797

cal director or chief medical officer. The specific responsibilities include the following.

1. Providing direct psychiatric services through comprehensive evaluation, diagnosis, treatment planning, and treatment for patients assigned to him or her.

2. Making final decisions regarding admissions and discharges of patients in accordance with medical standards.

3. Assuring appropriate psychoeducation for patients, families, staff, and community professionals and lay people.

4. Assuring the involvement of families whenever possible, with the patient's consent, in treatment planning.

5. Assuring that clinicians in services assigned to him or her receive appropriate clinical supervision on a regular basis.

6. Participating in administrative duties as assigned, which could include, for example, being a member of or chairing the quality assurance and/or utilization review committees.

7. Providing psychiatric leadership to interdisciplinary teams. The staff psychiatrist's responsibility in a multidisciplinary inpatient team includes treatment team planning and regular reviews that comprehensively address the patient's biopsychosocial needs.

8. Providing psychiatric in-service training to other clinical staff.

9. Serving as psychiatric liaison to community care providers, particularly with regard to continuity of patient care.

10. Identifying and advocating needed resources, including staff, to the medical director.

A staff psychiatrist must be board certified or board qualified. If he or she is working on a subspecialty unit, appropriate subspecialty training and/or supervision is required.

### GUIDELINES FOR PSYCHIATRIC AND OTHER MEDICAL EVALUATION AND TREATMENT OF PATIENTS

1. Each patient should receive timely, comprehensive psychiatric evaluation, diagnosis, and treatment planning in the biological, psychological, and social spheres.

2. Each patient should be medically screened and his or her history should be reviewed to assure that the full range of medical and surgical considerations is taken into account in determining the diagnosis and appropriate treatment; medical or surgical consultation should be assured when indicated.

3. A psychiatrist may prescribe or adjust psychotropic medication only after his or her direct evaluation of the patient, except in times of emergency; in the latter case, timely direct evaluation should follow.

4. A patient receiving medications should have his or her medications reevaluated by a psychiatrist as clinically appropriate and at least monthly, although preferably more frequently. Patients not receiving medications should be reevaluated by a psychiatrist at timely, clinically appropriate intervals.

5. The frequency, process, content, and duration of any psychiatric evaluation or intervention should be based on patient need and not on administrative or fiscal considerations.

6. Quality assurance and a utilization review of patients should include appropriate medical/psychiatric participation.

### GUIDELINES FOR EMERGENCY COVERAGE

1. Direct emergency psychiatric services during all times, including nights, weekends, and holidays, should always be provided by a psychiatrist or resident under the supervision of a psychiatrist.

2. Emergency medical and surgical services must be available or readily accessible at an acute care hospital.

### PSYCHIATRIC RESPONSIBILITIES IN A MULTIDISCIPLINARY TEAM

In public psychiatric inpatient facilities, psychiatric multidisciplinary teamwork with other clinical services the following functions.

1. To assure that the psychiatric and other medical services provided meet prevailing professional standards.

2. To assure the involvement of patients and families in treatment and discharge planning whenever possible.

3. To provide regular opportunities for collaboration between psychiatrists and other professional staff concerning patients they are treating in common.

4. To inform and educate other clinical staff regarding the aspects of patient health, the interrelationship of psychological and physiological problems, and the appropriate use of psychotropic medications, their side effects, toxicity, etc.

5. To provide support for clinical staff in dealing with especially disturbed patients.

### GUIDELINES FOR PSYCHIATRIC STAFFING

Psychiatric staff should be qualified in training and experience and adequate in numbers for carrying out the functions described in this document.

### GUIDELINES REGARDING PSYCHIATRISTS' SIGNATURES

Psychiatrists should adhere to the "Guidelines Regarding Psychiatrists' Signatures" (1) approved by the APA Board of Trustees in 1988.

### GUIDELINES REGARDING PSYCHIATRIC ETHICS

Psychiatrists should adhere to *The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry* (2).

### REFERENCES

1. Guidelines regarding psychiatrists' signatures (APA official actions). Am J Psychiatry 1989; 146 1250
2. The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry. Washington, DC, American Psychiatric Association, 1989

◄Return to Full

# LexisNexis™ Academic

Copyright 2007 Strafford Publications, Inc.
All Rights Reserved
Health Law Week

February 23, 2007

**SECTION:** Pg. 24

**LENGTH:** 267 words

**HEADLINE:** Written **informed consent** form creates presumption that patient gave **informed consent**:
Joiner v. Simon, No. C-050718 (Ohio Ct. App. Feb. 2, 2007)

**BODY:**

The Ohio Court of Appeal affirmed a jury's decision in favor of doctors in a malpractice case, ruling that the trial court did not err by allowing the jury to base its decision upon allegedly false testimony and by instructing the jury that a written consent form gives rise to a presumption of **informed consent.**

Laura Baskett was admitted to Jewish Hospital for chest pain. Dr. Jeffrey Schneider recommended that Baskett undergo an angiogram. Dr. Arthur Simon performed an angiogram procedure on Baskett and diagnosed her with coronary artery disease with lesion.

Dr. Joe Hackworth was a cardiologist who performed an angioplasty on Baskett. Baskett suffered complications during the angioplasty that required emergency bypass surgery and died.

Baskett's children sued the doctors for **medical** malpractice and **lack of informed consent.** The jury ruled in favor of the doctors, and the children appealed.

The court of appeal affirmed the jury's decision, ruling that the trial court did not err in concluding that Hackworth's testimony that he read Simon's angiogram report before performing the surgery was not false because the evidence showed that Hackworth consulted with Simon prior to surgery and read Baskett's chart. The court also ruled that the trial court correctly instructed the jury that a written consent form created a presumption of **informed consent.**

Source: Health Law Week, 02/23/2007

Copyright © 2007 by Strafford Publications, Inc. http://www.straffordpub.com/ All rights reserved. Storage, reproduction or transmission by any means is prohibited except pursuant to a valid license agreement.

**LOAD-DATE:** February 27, 2007

$E4.194$

# LexisNexis™ Academic

Copyright 2006 Strafford Publications, Inc.
All Rights Reserved
Health Law Week

November 3, 2006

**SECTION:** Pg. 25

**LENGTH:** 274 words

**HEADLINE:** Mother made prima facie case on issue of **informed consent.**;
Cicione v. Meyer, No. 07310 (N.Y. App. Div. Oct. 10, 2006)

**BODY:**

The New York Supreme Court, Appellate Division, Second Department, reversed a trial court's judgment finding a mother and her child made a prima facie case on the issue of **informed consent** in their **medical** malpractice action against a hospital and doctor.

Denise Cicione, who previously had a child via cesarean section, opted to attempt a vaginal birth after cesarean section (VBAC) for her second child. During the birth, Cicione's uterus ruptured, cutting off the oxygen supply to the fetus. As a result, the infant was born with extensive brain damage and died 13 days later.

Cicione, on behalf of herself and the deceased infant, brought a **medical** malpractice action against University Associates of Obstetrics and Gynecology P.C. and Drs. Anthony Royek and Bruce Meyer, alleging **lack of informed consent.** The trial court dismissed the action against Meyer, and the jury returned a verdict in favor of University Associates and Royek. The plaintiffs appealed.

The appellate division found the trial court erred in charging the jury with one interrogatory, as opposed to two separate interrogatories, on the issue of **informed consent.** Moreover, the trial court erred in dismissing the case against Meyer. The plaintiffs presented a prima facie case on the **informed consent** issue. In addition, the evidence did not support the jury's finding that Royek did not depart from accepted **medical** practice.

Source: Health Law Week, 11/03/2006

Copyright © 2006 by Strafford Publications, Inc. http://www.straffordpub.com/ All rights reserved. Storage, reproduction or transmission by any means is prohibited except pursuant to a valid license agreement.

**LOAD-DATE:** November 7, 2006

*Ex. 195*

◄Return to Full

# LexisNexis™ Academic

Copyright 2007 Strafford Publications, Inc.
All Rights Reserved
Health Law Week

April 27, 2007

**SECTION:** Pg. 16

**LENGTH:** 217 words

**HEADLINE:** Eye doctor may be liable for failing to obtain **informed consent** from patient; Handa v Munn, No. COA06-0808 (N.C. Ct. App. Apr. 3, 2007)

**BODY:**

The North Carolina Court of Appeal reversed and remanded a trial court's decision to grant summary judgment in favor of an eye doctor in a **lack of informed consent** case, finding that issues as to whether the patient consented to the risks involved in an eye surgery existed.

Narindra Handa was a patient of Dr. Albert Munn. In his right eye, Handa's vision was correctable to 20/20, but he only had peripheral vision in his left eye. However, Handa could still read a book, drive a car and perform other activities. Munn recommended a corrective surgery that would improve vision in Handa's right eye.

Handa signed a consent form at Munn's office when his sight was blurry. Handa believed that the surgery did not have any risks. The surgery went afoul, and Handa lost most of his vision in his right eye and was left essentially blind. The trial court granted summary judgment in favor of Munn, and Handa appealed.

The court of appeal reversed the trial court's decision, ruling that issues as to whether Handa gave his **informed consent** for the surgery existed.

Source: Health Law Week, 04/27/2007

Copyright © 2007 by Strafford Publications, Inc. http://www.straffordpub.com/ All rights reserved. Storage, reproduction or transmission by any means is prohibited except pursuant to a valid license agreement.

**LOAD-DATE:** April 30, 2007

Ex. 196

# LexisNexis™ Academic

Copyright 2007 Strafford Publications, Inc.
All Rights Reserved
Health Law Week

May 11, 2007

**SECTION:** Pg. 15

**LENGTH:** 348 words

**HEADLINE:** Patient may bring claim against doctor for implanting cadaver bone without consent; Murphy v. Implicito, No. A-1773-06T2 (N.J. Super. Ct. App. Div. Apr. 18, 2007)

**BODY:**

The New Jersey Superior Court, Appellate Division, ruled that a patient could bring a battery and breach of contract claim against doctors who implanted a cadaver bone in his spine but could not bring a **lack of informed consent** claim because there was no evidence that the implantation of the cadaver bone caused the patient's injuries.

David Murphy suffered injuries to his back at work, and his doctors recommended he undergo surgery on his spine. The doctors recommended the implantation of a bone in Murphy's spine. Murphy agreed to the surgery, but under the condition that a cadaver bone would not be used.

The doctors agreed to perform the surgery without using a cadaver, but with Murphy's own bone. However, during surgery, the doctors used a cadaver bone. After the surgery, the cadaver bone failed to fuse with Murphy's bone, causing him to become totally disabled.

Murphy sued the doctors for malpractice, **lack of informed consent,** battery, and breach of contract. Murphy's wife made a claim for loss of consortium. The trial court dismissed the complaint, and the Murphys appealed. The court of appeal affirmed the dismissal of the **informed consent** claim and reversed the dismissal of the battery and breach of contract claims.

The trial court entered an order limiting Murphy's recovery to damages caused directly by the use of the cadaver bone material. Murphy appealed.

The appellate division reversed the trial court's decision, ruling that, if a jury found that the doctors committed battery, then it could award damages for excess harm to Murphy if it could segregate the damages suffered from use of the cadaver bone. Further, the appellate division found that the doctors had the burden of segregating the damages. The appellate division also ruled that the breach of contract claim did not have to be limited to economic damages.

Source: Health Law Week, 05/11/2007

*E4. 197*

◄Return to Full

# LexisNexis™ Academic

Copyright 2007 Strafford Publications, Inc.
All Rights Reserved
Health Law Week

June 22, 2007

**SECTION:** Pg. 32

**LENGTH:** 384 words

**HEADLINE:** Malpractice suit not necessarily time-barred because of typographical error; Anderson v. Lindenbaum, No. 05CS774 (Colo. May 29, 2007)

**BODY:**

The Colorado Supreme Court reversed and remanded a trial court's decision to grant summary judgment to a doctor in a **lack of informed consent** malpractice case, finding that a discrepancy between a letter and the patient's affidavit as to the date she discovered the malpractice could be explained by a typographical error.

Nadine Andersen's legs were unequal in length, so she sought advice from Dr. Stephen Lindenbaum. Lindenbaum informed Andersen that the only way she could make her legs even was to shorten the healthy longer leg. Thus, Lindenbaum performed surgery to shorten Andersen's leg. However, the surgery caused complications, forcing Andersen to file a disability claim with social security.

Before undergoing the surgery, Andersen sought a second opinion from Dr. Carl Rasimas. Unbeknownst to Andersen, Rasimas wrote a letter to Lindenbaum suggesting that Lindenbaum had the option of lengthening Andersen's shorter leg. However, Lindenbaum never advised Andersen of this option.

In November 2000, when Andersen was in the process of applying for social security benefits, she obtained her **medical** files from Lindenbaum. Thereafter, Andersen discovered Rasimas' letter. Andersen wrote a letter to Rasimas stating that she did not know about the option of lengthening her leg until January 2000.

Andersen sued Lindenbaum for malpractice. During her deposition, Andersen stated that she discovered Rasimas' letter in January 2001. Due to the discrepancy between her letter to Rasimas and the deposition testimony, the trial court granted summary judgment to Lindenbaum, finding that Andersen's claim was barred by the statute of limitations. Andersen appealed, contending that the January 2000 date in her letter was a typographical error because she did not even obtain the **medical** file until November 2000, or later when she applied for social security benefits.

The supreme court reversed and remanded the trial court's decision, finding that the date discrepancy could be explained as a typographical error, and that Andersen's claim could be timely.

*Ex. / 98*

FRANCISCAN HOSPITAL MT. AIRY CAMPUS
CINCINNATI, OH

Physician Attestation                          05-02-2000

Name:  AMADASU, DARLINGTON O.                   MR#:   600420469
Visit Type:  I        Inpatient                 Acct#: 710179329
-----------------------------------------------------------------------------
Admit Date:     04-25-2000  Birthdate: ▮▮▮▮▮▮   Sex:  M    Male
Discharge Date:  05-01-2000  Age:      51       DR:   2210  BERRY, RAVI
Discharge Status: 05        Birth Wght:         Payor: M    Medicare
Secondary Payor:

DRG:  430  PSYCHOSES

LOS:       6 days      Trim Point:   0.00 days      Weight:  0.7881
GMLOS:  6.00 days      Outlier:      6.00 days      Payment:
                                                    Charges:
-----------------------------------------------------------------------------
Admit Dx:
  296.30    RECURR MAJOR DEPRESSION

DIAGNOSES:

Principal Dx:
  296.30    RECURR MAJOR DEPRESSION

Secondary Dx:

ICD9 PROCEDURES:                  Ep#  Dr.   Name                    Date

$Ex. 199$

I certify that the narrative descriptions of the principal and secondary diagnoses and
the major procedures performed are accurate and complete to the best of my knowledge.

PHYSICIAN'S SIGNATURE: _____  DATE: 7/2-4/00
                        BERRY, RAVI



Practical Guide to the

Care of the

Medical Pati...

Fred F. Ferri, MD ...

**M** Mosby

Ex. 200

## ETIOLOGY OF CHRONIC DIARRHEA

1. Drug induced (including laxative abuse)
2. IBS
3. IBD
4. Lactose intolerance
5. Malabsorptive diseases (e.g., mucosal disease, pancreatic insufficiency, bacterial overgrowth)
6. Parasitic infections (giardiasis, amebiasis)
7. Functional diarrhea
8. Postsurgical (partial gastrectomy, ileal resection, cholecystectomy)
9. Endocrine disturbances
   a. Diabetes mellitus (decreased sympathetic input to the gut)
   b. Hyperthyroidism
   c. Addison's disease
   d. Gastrinoma (Zollinger-Ellison syndrome)
   e. Vipoma (pancreatic cholera)
   f. Carcinoid tumors (serotonin)
   g. Medullary carcinoma of thyroid (calcitonin)
10. Pelvic irradiation
11. Colonic carcinoma (e.g., villous adenoma)
12. Collagenous colitis: middle aged woman normal barium enema and endoscopy subepithelial acellular collagen band on rectal biopsy, symptom resolution with sulfasalazine

### Diagnosis

1. History, physical examination, and initial laboratory evaluation are the same as for new-onset diarrhea
2. Additional laboratory evaluation
   a. Examine stool for presence of fat droplets (use Sudan III stain) and meat fibers; their presence indicates malabsorption; see Fig. 26-2 on p. 338)
   b. If CBC shows macrocytic anemia, obtain vitamin $B_{12}$ and RBC folate levels to rule out megaloblastic anemia secondary to malabsorption
   c. Sodium hydroxide test for laxative-derived phenolphthalein should be done in patients suspected of laxative abuse
   d. Magnesium-induced diarrhea can be diagnosed with a quantitative fecal analysis for soluble magnesium[%]
   e. 24-hour urine collection for 5-HIAA in patients with suspected carcinoid syndrome; serum gastrin level in patients suspected of Zollinger-Ellison syndrome
   f. Define mechanism of diarrhea
      (1) Secretory diarrhea results from impaired absorption or excessive intestinal secretion of electrolytes (fecal fluid contains large amounts of electrolytes); following is a list of common causes of secretory diarrhea:
         (a) Enteric infections
         (b) Neoplasms of exocrine pancreas (VIP, GIP, secretin, glucagon)

---

### Differentiation of Osmotic from Secretory Diarrhea

Obtain 24-hr stool collection and measure the following:
1. Volume (normal <250 ml/day); if increased, make patient NPO and observe effect on diarrhea.
   a. Persistence of high volume indicates *secretory* diarrhea
   b. Decreased volume indicates *osmotic* diarrhea
2. pH; if less than 5.5, indicates carbohydrate malabsorption, thus *osmotic* diarrhea
3. Osmolality (normal <290 mOsm); if greater than 290 mOsm, indicates *osmotic* diarrhea
4. Electrolytes ($Na^+$, $K^+$); there are two methods to differentiate osmotic from secretory diarrhea based on stool electrolyte values:
   a. Multiply the sum of $Na^+$ and $K^+$ by 2 and compare with stool osmolality and serum osmolality

      If $2 \times (Na^+ + K^+) =$ Measured stool osmolality, indicates *secretory* diarrhea

      If $2 \times (Na^+ + K^+) + 25$ mmol/L is less than measured serum osmolality, indicates *secretory* diarrhea
   b. Calculate the stool osmotic gap

      If stool osmolality $- 2 \times (Na^+ + K^+) > 100$, indicates *osmotic* diarrhea

When all the above laboratory tests indicate malabsorption, additional work-up for malabsorption should proceed as indicated in Section 26.5.

---

         (c) Bile salt enteropathy
         (d) Villous adenoma
         (e) IBD
         (f) Carcinoid tumor
         (g) Celiac sprue
         (h) Ingestion of cathartic agents (e.g., phenolphthalein)
      (2) Osmotic diarrhea results from impaired water absorption secondary to osmotic effect of nonabsorbable intraluminal molecules; following are a list of common causes of osmotic diarrhea:
         (a) Lactose and other disaccharide excess
         (b) Drug induced (lactulose, sorbitol, sodium sulfate, antacids)
         (c) Postsurgical (gastrojejunostomy, vagotomy and pyloroplasty intestinal resection)

26.5    **MALABSORPTION SYNDROME**

### Definition

Malabsorption syndrome is defined as impaired intestinal absorption manifested by steatorrhea and various nutritional deficiencies.

E4. 201